Next case is CBT Lint Partners vs. Return Path in Cisco Ironforge Systems, 2012-14-16. Mr. Josepho, when you're ready. Good morning, Your Honor. On remand from this court, the district court granted summary judgment on a very limited basis. The theory being that the fees that senders of email pay are not paid in exchange for guaranteed delivery of emails, and that theory was was flatly wrong for two reasons. First, there lied in the claim construction of a guarantee that defendants don't even attempt to defend on appeal. And second, we presented abundant evidence from defendants on documents saying that the products do provide a guarantee or assurance of delivery. Well, they allow forwarding, which isn't necessarily a advertising fee. Are there any advertising fees here, or are there just other kinds of fees? Well, all of the fees are an advertising fee. The term advertising fee, the claim explains. It's a fee, you know, what is it the claim says. It's a fee in exchange for... That's what the claim says. Allowing forwarding, right. What does the support and the specification and what do the defendants do? Right, well, the specification gives no indication that advertising fee means anything other than what the claim says. Well, the word doesn't even appear in the specification, does it? That's right. So it is not... It's one of the situations where I know normally you would be looking to read some other meaning into the word advertising, because it's there. But this is one of these instances where the claim goes on to explain what it means. The advertising fee is in exchange for. So that's what it means. That's all it can mean. There's no support and specification for putting any other meaning into it, and there's no other plausible meaning you could put into it. Now, they say, well, maybe it's paid something... Someone pays for subjective purpose of advertising, but interjecting a subjective purpose into a claim construction without... But the advertising fee only shows up in claim 13, doesn't it? An added claim. What? An added claim. Yes. But there's no basis for reading it to mean anything other than what the claim describes it as being. And what they do in terms of their fee structure is the specification also says, in terms of the fee, it doesn't matter how you collect it, how you allocate it, how you spend it. It just matters it's the described fee. And so the fact that they call their fees different things and break them up into two or three pieces, it doesn't matter to the substance of what we're talking about here. The substance is fees paid in exchange for allowing emails to be forwarded. The claim, as you are interpreting it, seems to me to be pretty broad. Are you... Would you say that this claim reads, for example, on a system in which someone provides a service for money, that's normally why people provide services, in exchange for any form of increasing the likelihood that their email will be forwarded ultimately to the recipient? No, I think it's more than that because, you know, allowing for... In what respect is it limited so that your claim construction does not read on what I just said? Sure. The fee... Well, in terms of just the plain language, right, allowing to be forwarded, right? You do the... For what you pay, you are paying for, you know, allowing email to be forwarded. Right. And now the thing is... My hypothesis is it seems to me that what your claim says, as you are interpreting it, that's all you need. Money paid and increased likelihood of forwarding the email and you're done. Well, what you're paying an agreement for, though, is, I think, actual forwarding. The point's just that... In terms of direct infringement here, right, you've got a computer that's programmed to... What's claimed here is a computer, and that computer is going to be at, you know, say a router, an internet service provider, maybe a system administrator, something like that. You know, it keeps going downstream. And so what we're talking about is the claims computer... At most, I think you could say, let's say the claims computer will allow the email to be forwarded. And that's an incredibly valuable service because you get through that spam filter, which is a big deal to the sender of the email. But that doesn't mean that you're necessarily going to get through every downstream spam filter. And the specification makes that clear. Because the specification says that for any individual user, you know, the service could be activated or disactivated, which is somewhat obvious in a... I mean, in a free society, there's no way to guarantee that any email will necessarily get through to anybody. What we do have here, though, is if you sign up for this... And the facts here, which I should explain some more, I mean, you are... Documents are right. It's a guarantee. It's an assurance that vast amounts of your emails will, you know, will be allowed to be forwarded and will also actually reach the recipients because of the way they've set it up. It's... The defendants did two things, right? First, they get people to pay to be on the wait list, which is the definition of the authorized sending party. And then the other thing they've done, and Jay walks through this nicely, is they've gotten vast numbers of people to allow ISPs and whatnot to allow emails to be forwarded through that. So, for example... So, what it is, it's a factual question, I suppose. It's not really... Which, in our view, is not a summary judgment question, but it is. When you sign up for this, you know as a fact that you will get vast amounts of emails will be allowed to be forwarded through this. And just to give you some examples... Well, you seem to rely on support, I think you've pointed out twice here. And I think you're referring to documents that are discussed in the brief, that there's some document that's produced by ReturnPath that says that there's a guaranteed email delivery. My understanding, however, is that that involves non-accused products, like MSN and Hotmail, and not the accused products. Well, no, the... There are two separate sets of accused products here, right? Talking about the wait list are accused of indirect infringement. Yeah. We're talking about direct infringement? Well, yeah, if I can talk about indirect infringement first for the accused... Okay, the direct infringement is limited to... I'm sorry, that's what you want. The direct infringement is limited... It focuses on the message transfer agents, which are specific anti-spam appliances that are sold by the defendants. Now, most of what the wait list do is not through them, which is why we have a separate indirect infringement. But for the message transfer agents, they, in the words of the claim, they are programmed to be able to query the wait list to determine whether someone is or is not an authorized sender, whether someone's on the list. That's the direct infringement theory. And there's substantial evidence in the user guide that they come with that program's built-in capability, which is what the claims require. That's the direct infringement theory. It's limited to those, okay? You're talking about MSN and others. They're relevant to the indirect infringement theory against the wait list themselves. Because the wait list, the indirect infringement theory is that it's MSN or Hotmail or... I mean, these programs have grown to the extent that they're not authorized to query. We were talking about, you know, according to the defendant's own documents, tens of thousands of internet service providers, companies, universities were using the wait list to check on behalf of something like two-thirds of all consumer email accounts out there. They were querying the wait list billions of times a day. And as a result, hundreds of millions of emails were getting through that otherwise would not. I mean, that's the scope of what's going on here, which is why when I sign up, as a bulk supplier, as a bulk emailer, my emails really will be allowed to be forwarded. That's why they can put in their documents that it's a guarantee, because it's such a massive scale that it is. Maybe not every last one, but these are bulk emails. It does allow forwarding of massive amounts of email. And so, in terms of the indirect infringement, what I was trying to get at is that it's... I'm sorry, I lost my train of thought there. On the indirect infringement, it's the MSN or whatnot that would be the direct infringer. Because it's the ISP, the corporation, whatever it is, that's computer, it's programmed to detect and analyze the email by checking the wait list to see whether I'm on it. That's the direct infringer, the MSN or whatever. But that then provides the predicate for our indirect infringement allegations against the wait list themselves. So that's why the infringement structure is on the wait lists, we just have to prove for indirect infringement, we just have to prove there's some predicate act of direct infringement out there somewhere. And here, we have massive circumstantial evidence of extraordinary amounts of direct infringement. And then, on the direct infringement, it's just the MTAs, so it's a much more limited theory there. And I could, just to explain a little more about what they do, the reason that this program is so big and really does guarantee email is that defendants... I mean, just to explain a bit more how it works, if you look at JSA 3462-63, it's a confidential document, I can't really discuss it here, but it explains their business strategy of how they built up lots and lots of people who would, in fact, query the wait list. And it's described in greater detail at JSA 3244, it explains it nicely by explaining that one of the keys to the rapid adoption has been the ease of use of the wait list. Receivers download lightweight plugins for common software packages or make use of a number of spam filters. And what happens is, well, the receiving mail gateway will look up on sender score certified and then passes messages with positive responses upstream, ensuring that they get delivered. The reason that so many people pay for this and the reason that so many people use it is that it's an incredibly valuable service at whatever the spam filter may be, normally an ISP or the gateway to a company or something like that, screening some off, allowing others to be forwarded. That's why it has been highly successful technology. They've also made it especially easy for recipients of email, ISPs and whatnot, to sign up and use it by, for example, not only providing the plugins, not only letting people... Is there a difference in your view between increasing the likelihood that the email will be forwarded versus, I know there's a dispute about allowing versus guaranteeing, but essentially ensuring that the email will be forwarded. Is there a difference between those two? Well, factually there can be, but I mean, I guess two things, right? First, if the claim construction has a guarantee in it, obviously we think, you know, we disagree with that and don't know where it would come from. Well, let's stay away from the word guarantee then. I mean, the claim construction deals with allowing it, which forgetting guarantee, allowing it means if A exists, B happens. It allows that to happen. Right. Well, remember, you enter into an agreement. I mean, there are a couple of pieces to this, right? It's a somewhat odd claim because the computer is just, the accused product is a computer that's programmed to figure out if you're on the list. That's relevant here, period. But the reason there's more to it is that in the definition of the sending party, right, authorized sending party, it has to be someone who's entered into an agreement, right, to pay money in return for allowing emails to be operated. Now, in theory, this is obviously not the case at all. I mean, in theory, as long as you enter into that agreement, right, I mean, you could get scammed and never get a single email forwarded, but there'd still be an authorized sending party. It wouldn't be a infringement lawsuit. It'd be a fraud lawsuit. But here, none of that's the case because you know for sure when you enter into this. There's a reason the defendants can say in all their materials, you know, we guarantee, we ensure, you know, vast amounts that your emails will actually get through. And the reason is that they've built up this network of, you know, standard spam software, anti-spam software out there using their product in exactly the described manner of other people using the plug-ins to do it. And so what you've got, and the other sites I was going to give you, just in J3244 were then J3555 and J3479, you know, where it says that bonded sender email bypasses the spam filter and goes directly to the recipient's inbox. And they've done a very good job of building up a system as sort of a third-party intermediary so that there really as a spammer, you know, what I want is just to spam people. And for sure, you know, when I sign this up, I know that I'm going to get vast amounts of email will be allowed to be forwarded because of this. Their documents say that. The jury could certainly rely on their documents that say that. And then all this other evidence, there's vast amounts of email, vast amounts of use of the system. And the ways in which defendants have made sure that it's true, you know, show that if they want to argue to the jury that, you know, well they were lying when they said there was an I mean, they can. But we got a pretty good response from the jury. And it seems to me we have an overwhelming response of summary judgment. Mr. Joseph Roper, you wanted to save time for rebuttal? Thank you. I'll save you two and a half minutes. Mr. Godet or Godet? Godet. Thank you and good morning. I want to start with actually a phrase from the last argument about the heart of the invention or the gist of the invention. And I think we actually have an agreement on a point here. If I wrote this down correctly, CBT's counsel statement was that the quid pro quo is you pay money and the accused computer, quote, will allow email to be forwarded, close quote. And what he was saying is that the fact that maybe something downstream, some other computer, might not deliver to the intended recipient, that doesn't matter. We agree completely. And with that admission, the summary judgment order is unquestionably correct. The other part of the claim is an agreement. You're saying it's a guarantee. I'm not, Your Honor. And the district court, I'm not sure that matters. That word guarantee didn't appear anywhere in the summary judgment order except in the seven page, it appeared once. There was a seven page analysis. The district court quoted the claim language 12 times. The district court used the word guarantee a single time and used that word guarantee a single time. It's at JA13. I'll read the sentence. Being on the bonded sender list, however, did not guarantee that the MTA would allow an email to be delivered. It doesn't replace would allow. It's an absolutely accurate statement. If you're on the bonded sender list, it doesn't guarantee you'll be allowed. It does seem like something of a red herring here since, at least for present purposes, I think we understand what allow means, that you blessed the email. And if somebody later regards the blessing as insufficient, or there's a problem, or there's a mechanical problem, so be it. But if the system in question blesses the email, it increases, at least theoretically, the probability that the email ultimately will be received. And that's what the invention is about, correct? With one nuance, Your Honor, the part that now CBT completely agrees with is it might well be that downstream something derails the delivery process. But with respect to the accused computer, and in this case that's the Cisco MTA, the accused computer will allow it to be forwarded. So in return for the payment, the accused computer has to allow it to be forwarded, and there is nothing of the sort in this record, Your Honor. And again, what I'm focusing on is what the claim reads on. And that is the gist of the claim, right? I mean, your argument is, and that explains why we don't infringe. Let me give you an example. I'm struggling with the breadth of this claim in trying to figure out just how much ground it covers. Suppose that I'm a non-profit, and I believe there's a market out there for people who want to receive emails from non-profits, but they don't want emails from anybody else. And you devise a system in which you say, the non-profits are going to pay me a tenth of a cent per unit of email, and I will tell you that I will screen all your emails, and you'll only get emails from non-profits. And the question is, does that infringe Claim 13? Your Honor, I want to be sure I sort of understand where everything's happening in the hypothetical. I think I may have gotten you playing two roles. But yes, in other words, the accused system is a system which screens emails for the ones that are non-profits and gets money from non-profits in order to provide the service of screening and sends them on to people who only want to receive emails from non-profits. Okay, and in that hypothetical, is the accused service here happening somewhere actually on the route between the sender and the recipient, so you can control that decision? Right. So long as the result of paying the money is, we will then allow that to get past this checkpoint, that computer, I think that would be within it. Once we decide it's a non-profit, and we've made that decision with respect to certain senders. No, the key decision, it's not that it's a non-profit or not, it's whether or not the computer can determine that agreement has been made to pay a fee. And I understood... Well, a fee has already been paid by each of the people who are claiming to be non-profits, and what the system is promising is that they will check and make sure that those are actually non-profits, and that's what they're getting paid for. I'm working through this in my mind, but the claim would require that that sender has paid a fee in return. And the only people that are going to be allowed to pay that fee are people that have been screened as to whether they're non-profits or not. Others will not be allowed to enter the game. I think we need to know a little bit more about the nature of the fee. In other words, if you pay the fee, will you absolutely get forwarded? And if the answer is you pay the fee, you will get forwarded. The fact that there is an additional... Unless we discover that you're not really a non-profit. Right. I mean, I think the fact that there is an additional restriction, in other words, in addition to paying a fee, you also have to be a non-profit. I'm not sure that anything rises or falls on that. You're trying to distinguish between... Judge Bison could have two alternative hypotheticals. One could be everybody pays the fee, and then subsequent to the payment of the fee, there's an additional screening, but they still keep the fee. What you're concerned about is you might be saying that they only take the fee once they've determined that you actually are a non-profit. Right. To be sure that, in fact, there's a quid pro quo. I mean, this is within the specification. The word agreement appears seven times. It's an explicit agreement. It's on a per-recipient, per-email basis, and it's a very simple transaction. You pay the money, the email comes through. If the system starts with that proposition, that is to say, if you pay the money, your email will go through, and the computer has to determine that you, in fact, have paid that money, and your email goes through, adding an additional screening that only non-profits are eligible would be okay. If instead the system was that there was some... More like one of the... That's where I'm going, because your system has an additional step in which, in effect, it's determining this person is bogus. Your Honor, it's not the additional step. It's the lack of the claimed step. There is nothing in our system whereby... Additional step is not... Right. But there's nothing... But I understand it's different from the claim, in your view. And, in fact, I mean, the easy way of knowing this is that these lists have absolutely no control over what happens on any computer, and the agreement, the only agreement that's in the record says that. It explicitly disclaims any ability to increase deliverability. It's the opposite of the claim. It's the opposite of a quid pro quo. We will not tell you it's going to... As I understood, Mr. Joseph, or maybe you know this case better than I, so I misunderstood, but he referred repeatedly to some sort of guarantee, and this is not with respect to claim construction, because we don't want to go there, but with respect to the accused products, right? Correct. Your Honor, what Mr. Joseph was referring to were a number of documents where, in describing the system, iron court or return pass say the system will ensure delivery of email by guaranteeing compliance with certain certifications and that sort of thing. If the claim read as it reads, and at the end of it it says, and thereby guarantee, that evidence might satisfy that extra element, but nothing about those documents demonstrate that there is an agreement, that there was a payment made, and that it's a simple binary thing. You pay the money, the email goes through, and nothing about those documents suggests that any completely separate non-infringement issue, the lack of any computer that ever actually allows or does not allow an email to go through based on whether or not you're on those lists. And I want to take a moment on this point, because Mr. Joseph pointed out the idea of MSN and Roadrunner, and said that those are the third-party computers for the indirect infringement claim, and again, somewhat borrowing from the previous argument, that position was never articulated at the district court. The only thing they can cite to is page, it's, we quoted it on page 41 of the red brief at JA 3741, I'm sorry, we cite this, and we quote this on page 41 of our red brief, it's a quote from JA 3741, which is the opposition brief to our summary judgment motion. This is the only time there's a reference to Hotmail, MSN, and Roadrunner in front of the district court. It says, in addition, the evidence to date shows that the defendants induced others, including ISPs, such as Hotmail, MSN, and Roadrunner to use their infringing programs. Those are parties. That doesn't tell you what the computer is. The next sentence answers that question. For example, the user guide and advanced user guide for the Cisco MTAs provided instructions and examples on how to use the Cisco MTAs to forward email messages. There's never a suggestion at the district court that there's any patent to satisfy that computer element other than the Cisco MTA. And this, the last time that we were here, when Judge Lurie and Judge Bryson in the prior appeal, that's what that whole appeal was about. It was all about the computer. This isn't sort of a minor claim element, it's a crucial part of the claim. And there was never a suggestion that any computer, other than the Cisco MTA, would satisfy that. And that's, that provides, in addition to everything else I've said this morning, that's a completely independent basis for non-infringement because the Cisco MTAs don't query that list. The Cisco MTAs get information from a separate computer that's sort of think of as being at Cisco's headquarters called sender base. And what sender base does is it calculates a reputation score for every known sender of email on the internet. So everyone in this courtroom has a reputation score on sender base from plus 10 to minus 10, so many have ever sent email. There are 100 different factors that go into that calculation. Until 2008, one of those 100 factors was whether or not a sender is on one of these two lists. The result of that is that sender base would then give the Cisco MTA the number, plus 10 or minus 10. As the district court found, it is impossible to discern whether or not a sender is or is not on the list from that number because there are so many other factors. But it's conceivable that that number being on the list would be the, what puts you over the top, right, under certain circumstances, right? If there are 100 factors, you could be number 100 and that could put you over the top. It's certainly possible it could have that effect, but the computer, the Cisco MTA, has to make the determination of whether you are an authorized party or an unauthorized party. So the Cisco MTA that has no interaction with that list has to be able to figure out, I mean, if you buy their theory of the case, are you on the list or are you not? And it is impossible to make that determination because they don't know. All they got is a number from plus 10 to minus 10. And so, again, even if, even if, everything we said about the lack of an agreement, that there's no quid pro quo, even if we were wrong about all that, and I submit that's spot on, that's one reason that we win the case. Separate and apart from that, they have not satisfied the element that we addressed on the previous appeal because the Cisco MTA can't do it via CinderBase. They never accused any other computer. And on appeal, and this is, this was, this really wasn't any part at all of the district court case, they've now said, well, the Cisco MTA could be reprogrammed to query the botnet sender list or the sender certified list because the Cisco MTA is capable of making a DNS query. Well, every computer just about in the world can make a DNS query. That's a very generic process where you ask a third party server, you know, you present some address and it gives you a value back. The wording of this claim requires that the accused computer be programmed to, you know, accomplish the various claim elements. And as in the Finjen case and the Fantasy Sports case, it's based on the wording of the, you look at the wording of the claims and what they're accusing. Here, they're accusing an instruction to access the bonded sender program, that list, as a thing that would infringe. So, they would have to show, in using the Finjen test or the Fantasy Sports test, that this DNS query is sort of a fallback position. They would have to show that an instruction to query that specific list pre-exists in the software. It exists when you take it out of the box and there is absolutely no evidence. In fact, the only evidence in the record they're citing says exactly the opposite. The user, it's not as if there's some kind of a drop down menu and you can select it. It does not exist. The user would have to type in a command to make it go and make that query. And, you know, they had all the discovery they wanted. They got millions of documents from us. They got six copies of the source code of those MTAs. And there's not a shred of evidence suggesting that any of that is on the system or that anyone ever did that. For the very simple, and it's logical because Senderbase is the Ironport franchise. It's unlikely that anybody ever would do it and reprogram the thing. But, again, the record evidence shows that the computer as programmed does not do that. It does not have that instruction on it. And, again, I say that this case has been going on since 2007. This case was never about that. This case was never about some prospect of a DNS query or some third party other than the appellate counsel. But that's not what the case was about. This case was about Cisco MTAs and about these two lists. And for two separate reasons, the plaintiffs cannot get past summary judgment on this record. Thank you, Your Honor. Thank you, Mr. Gaudet. Mr. Josepher has two and a half minutes left. Thanks. Just a couple topics. First, why don't I start with the computers. In terms of the direct infringement by the message transfer agents, the argument that good appellate lawyers made up the theory that the message transfer agents can directly query, and it wasn't in the summary judgment brief. If you just look at JA pages 37, 37 to 37, 38, that's our opposition to summary judgment, district court brief, that made exactly the same argument. It's well preserved. Second, in terms of the content of it, the user manual, and everybody's pointing to the same couple pages of the user manual. The user manual says that you, the user, have the ability to query white lists like bonded sender, which is names by name, and that you have the current ability to do so. Now, their argument seems to be that, well, okay, what you have to do, though, is the reason that you, using the software, have this ability is that you have to activate it, specify your settings or whatnot. But that's not reprogramming, right? The code, I don't go in and change the code. I don't go in and change the programming. I just use it as intended according to the operating manual. And at a minimum, we'd have a factual question on that, too. If they really want to argue that what a user does to you, according to what's described by the operating manual, is clicking on, is doing this, doing that, they really want to argue that's programming. I mean, they can argue that to a jury, but if that's true, then I programmed my, you know, I was entering code into my TV the last time I set it up. It's just, that's not the way things really work. In terms of there being none of these other computers out there, I mean, our summary judgment repeatedly refers to these, all of these ISPs, companies, universities that check the whitelist. And as you pointed out, there's three of them by name. He's right. We didn't give like the make, model, and serial number of each computer that the ISP uses. But when we're talking about direct infringement as a predicate for indirect, I mean, circumstantial evidence that this is being done. I mean, if Roadrunner's doing this, right, if Roadrunner's checking this electronic list, the only way it can be doing it is through a computer in this program to do so. Right. I mean, in terms of like, think about Lucent or whatnot, we have vastly more circumstantial evidence here. So we didn't, I mean, we didn't say, yeah, they own, this guy owns a Mac or this guy owns a PC, but obviously they're doing it with computers. And we even identified some of the people who are doing it. Also, just the massive scale on which this is going on really leaves no doubt of that. And again, this was all in the summary judgment opposition. In terms of guarantees, to go to a couple of questions, in terms of what claim construction district court relied on, I mean, I would take the district court's word for it. And in his attorney's fees decision, he clarified, and it's much more clear than the summary judgment brief, but if anybody expressly says that, yes, I was relying on this claim construction, the CBT's construction was reasonable and therefore no attorney's fees. As you may or may not have noticed, Mr. Gustafson, your red light is on. So we will conclude the argument and take the case under advisement. Thank you.